Finch, J.
—It is impossible to read the charge with which the learned trial judge submitted this case to the jury without a strong conviction that his judgment hesitated upon the verge of a non-suit which we think he should have granted. He may have believed that, with a- clear demonstration which he gave of the plaintiff’s failure to show directly or by reasonable inference that the conduct of deceased was free from negligence contributing to the injury, the jury would render an appropriate verdict upon the question as one of fact. The result, however, was, as commonly happens, in favor of the plaintiff; the case comes here on appeal from that conclusion.
There is substantially no dispute about the facts. Two tracks of the Erie railroad, one known as the Buffalo division main track, and the other as a western division main track, cross Oanisteo street, in the village of Hornellsville, at an oblique angle. North of the Buffalo track is what is known as the Osborn house switch, which leaves the main track at a point westerly from the street and crosses it nearly parallel with the main line, but leaving an open space between at the narrowest point of seven and one-half feet. *171 Between the two main tracks there is an open space of ten feet six inches, and south of that are other switches. The map shows that in all there are six tracks crossing Oanisteo street, the line of the street and of the rails making quite an acute angle as they approach each other from the north and west. Philo P. Woodard, the plaintiff’s intestate, was employed at a coal yard owned by one Houck, which fronted on Oanisteo street and ran back to the premises of the railroad. While so employed be became entirely familiar with the crossing, and especially with the use made of the Osborn house switch. Upon that was placed the coal destined for delivery in Hornellsville, and the cars containing it were habitually shunted down that switch and across the street to the place of unloading. The plaintiff himself had often inquired at the freight office for his employer’s coal and directed upon what switch the cars should be placed. One coming down southeasterly along Oanisteo street from Houck’s coal yard, would have at his right, first, a vacant lot, bounded by a high fence, towards the rails, and, next, a building known as Grotty’s store. While passing that the track west of the crossing could not be seen, but when the southeastern corner was reached, being thirty-one and a half .feet from the intersection of the street with the rails, the switch could be seen to the west a distance of fifty-seven feet. When within ten feet of the track it could be seen a distance west of one hundred and thirty-seven feet, and the map shows that when within two feet of the track the switch could be seen for its whole length to the west and some stretch of the main track besides.
The plaintiff’s intestate and one Phelps approached the crossing carrying a basket of coal brought from Houck’s, and deceased was struck at the southerly rail of the switch, and when almost across it by one of the coal cars kicked down from the west and moving by its own momentum. The accident occurred in the middle of a bright and clear day when nothing existed to obstruct or hinder the sight; when the injured man was on foot and could have stopped at any instant, and when the merest glance along the switch to the west would have developed the approaching danger. The car and the man met at the intersection of track and of street. The highest speed of the former is put at four miles an hour, and if we call the walk of the latter as slow as one mile an hour, the cars moved four feet while he moved one; and when he was ten feet from the crossing they were but forty feet from the crossing and moving down upon it in plain sight If he was walking faster they were still nearer, and it is absolutely certain that at any time when within ten or fifteen feet deceased had only to *172 look and pause to be safe. Indeed Cook, called for the plaintiff, swears that the cars were within ten or twelve feet of them when the two men stepped upon the track. So that the facts make it absolutely certain that Woodard and Phelps either looked and saw the car coming undertook to cross in front of it, or did not look when that was their duty, and went blindly up the track taking the chances of what might occur.
The evidence is very slight that either of them looked to the west at all after passing Grotty’s store. Phelps admits that he looked only while passing that store, and so at a time when he knew that he had not guarded against the danger of the shunted car likely to come upon the crossing at any hour of the day; but if they did look after passing that point, the inference is inevitable that they saw the cars coming and misjudged their ability to cross in their front. The case is one where ordinary prudence and care were not shown or inferable, and for which no excuse or palliation can be given.
For the theory that their attention was diverted by the passage of a train to the west on one of the tracks south of the switch, and the movement of some coal dumps on another, so far from being an excuse for not looking as they approached the switch is itself an omission of an act of ordinary prudence. It concedes that they did not look for cars approaching on the switch, and seeks to excuse the omission. If they did look after passing the store they saw the coal cars coming, and could not help it, and any excuse for not looking is immaterial. Nothing in their situation or surroundings made it their duty to watch a train passing on another track and rapidly clearing the crossing.
Looking at that could do no good and subserve no useful purpose, and did not effect or influence deceased’s action while approaching the switch, and the excuse amounts to this and this only, that a man may prudently step upon one track without looking to see if it is clear, because he sees cars on another track which do not menace his safety or affect his action. A passing wagon on the street, or a new sign on some building may equally have diverted his attention, but the fact in each case would only have shown his lack of ordinary care and prudence. The west bound freight train had merely left the crossing when deceased was struck, and constituted neither obstruction nor danger to his further passage. One does not approach a railroad track with senses alert and watchful when he suffers his attention to be needlessly diverted from the present and immediate danger. . To be an excuse, the object or cause which so diverts his attention must be something which can justify consistently with prudence, the withdrawal of *173 attention from a near and imminent danger. Otherwise it is mere needless curiosity, which itself amounts to inattention.
As has become quite common, the case of Greany v. L. I. R. R. Co. (101 N. Y. 419) is cited as authority to support the plaintiff’s judgment. That case was close enough upon its facts to invoke a considerable dissent, but decision turned upon features not here presented. There the plaintiff herself testified that her crossing was blocked by a train standing at a station, and she stopped waiting for it to move. Its presence affected her action and properly engaged some part of her attention. She further said that she stopped just as it started; that as she came up to the track she stood and looked both ways and saw nothing; as she took a step or two, and just as she did so, saw a train coming from the east, but so close that she could not escape. It was coming at a dangerous rate of speed. Here the coal cars were moving without an engine, at about four miles an hour, and the west bound freight was on the third track ahead of deceased, with two open places, one of seven and one of ten feet intervening, and clearing the crossing at a rate which left deceased’s progress entirely unaffected. The men were on foot, wholly masters of their own movements, and whether they looked or did not look as they approached the track, their conduct was negligent.
There was no question for the jury to pass upon and the plaintiff should have been nonsuited.
The judgment should be reversed and a new trial granted, costs to abide event.
Rapallo, Earl and Peckham, JJ., concur; Danforth, J., reads for affirmance; Ruger, Ch. J., and Andrews, J., concur.